IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| GENERAL CHARLES E. "CHUCK" YEAGER (RET.), an individual; PMN II, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>FORT KNOX SECURITY PRODUCTS, INC., a Utah corporation,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:11-CV-91 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant Fort Knox Security Products, Inc.'s ("Defendant") Motion for Summary Judgment Regarding Plaintiff PMN II, LLC's Claims[1] and Defendant's Motion for Summary Judgment[2] against all parties and all claims. For the reasons set forth below, the Court will deny Defendant's Motion Regarding Plaintiff PMN II, LLC's Claims and will grant Defendant's Motion against all parties and all claims.

I. BACKGROUND

Plaintiff retired-General Charles E. "Chuck" Yeager ("Yeager") is a renowned and retired fighter pilot. Over the years, Yeager has commercially endorsed various products. Plaintiff PMN II, LLC ("PMN") is an entity formed to manage the proprietary rights associated with Yeager's commercial endorsements. PMN's managing member is Yeager's spouse, Victoria

---

[1]Docket No. 70.

[2]Docket No. 76.

1

Yeager ("Victoria").  Defendant manufactures, sells, and distributes gun safes and other security products.

Sometime in the mid-1980s, Yeager and Defendant entered into an oral agreement under which Defendant was authorized to use Yeager's name and likeness to promote Defendant's products.  The parties dispute the scope of this arrangement.  Plaintiffs assert that the agreement was limited to Defendant's use of Yeager's proprietary rights at the annual Safari Club International ("SCI") Convention.  Defendant contends that the agreement was more expansive, permitting reasonable uses of Yeager's proprietary rights to advertise Defendant's products generally.  Defendant proceeded to produce advertising materials using Yeager's name and likeness, including brochures and posters.

Defendant asserts that the agreement was orally modified sometime later to allow Defendant to brand a line of gun safes as the Yeager safes.  Plaintiffs dispute this modification, asserting that Yeager never agreed to such an arrangement.

As early as 1987, Yeager and Defendant began a new facet of their business relationship: Defendant purchased copies of a book authored by Yeager, which Yeager autographed and shipped to Defendant to be used as an enticement for potential customers to purchase Defendant's gun safes.  The evidence before the Court indicates that Defendant purchased, and Yeager autographed, a significant number of books as part of this arrangement.

In 1989, Yeager visited Utah to speak at an event for the Boy Scouts of America.  During the visit, he stayed at the home of Defendant's prior CEO, Thomas Arthur James and toured Defendant's facility.  While in town, a professional photographer photographed Yeager standing in front of one of Defendant's safes.  This photograph was subsequently used in Defendant's

promotional efforts. The parties dispute whether Yeager was aware that the safe in the photograph was part of the Yeager line of safes, or whether Yeager knew that the photograph would be used for promotional purposes.

In May 2007, Defendant uploaded a video advertisement to YouTube that mentioned its line of Yeager safes. Around 2008 or early 2009, Victoria began inquiring about the agreement between Yeager and Defendant. Defendant asserts that it became concerned about potential difficulty with its use of Yeager's name and likeness based on these questions, and discontinued its use of Yeager's proprietary rights, with one exception. At the January 2009 SCI Convention in Reno, Nevada, Defendant displayed a poster depicting Yeager.

On January 21, 2011, Plaintiffs Yeager and PMN filed this suit seeking an accounting and alleging violations of the Lanham Act for false endorsement, common law and statutory rights of privacy, and unjust enrichment arising from the oral agreement and subsequent alleged modifications. On April 26, 2013, Defendant moved for summary judgment against PMN, arguing that PMN lacks standing to bring this suit. On June 7, 2013, Defendant filed a Motion for Summary Judgment on all claims and against both Plaintiffs.

Plaintiffs' Complaint cites statutes from California, Nevada, and Utah as the legal basis for Plaintiffs' claim for statutory violations of privacy. In the summary judgment briefing, both parties cited a broad spectrum of legal authority from all three states, the Ninth and Tenth circuits, and more. The Court requested additional briefing from the parties regarding which state's laws apply to the state law claims. The parties agree that Utah law applies.

## II. LEGAL STANDARD

Summary judgment is proper if the moving party shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[3] In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[4] The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[5]

## III. PMN'S STANDING

Defendant argues that PMN lacks standing and should therefore be dismissed from this suit. PMN contends that it has standing to bring its claims because Yeager transferred to PMN proprietary rights to Yeager's name or likeness. In support of its position, PMN offered an affidavit by Victoria ("Victoria's Declaration") attesting to Yeager's verbal transfer and assignment of rights to PMN. Defendant contends that Victoria's Declaration should be disregarded by the Court because it is a sham affidavit and is based on inadmissible hearsay.

A. SHAM AFFIDAVIT

Although an affidavit may not be disregarded solely because it contradicts prior sworn testimony, "courts will disregard a contrary affidavit when they conclude that it constitutes an

---

[3] Fed R. Civ. P. 56(a).

[4] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[5] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

attempt to create a sham fact issue."[6] This rule is justified by "the conclusion that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony."[7] Defendant argues that Victoria's Declaration creates a sham fact as to Yeager's transfer of proprietary rights to PMN that will allow PMN to avoid summary judgment. Although Victoria's Declaration is inconsistent with other evidence, the Court cannot find that PMN presented Victoria's Declaration to create a sham fact.

PMN II, LLC's Response to Defendant's First Set of Interrogatories—dated December 27, 2011—includes the following statement: "[O]n or around January 13, 2011, General Yeager acted to confer certain right, title, and interest to his name to PMN II, LLC, with limited regard to Fort Knox's use of General Yeager's name or likeness in connection with the promotion or marketing of its safes."[8] Plaintiffs' Answers to Defendant's Second Set of Interrogatories—dated December 6, 2012—includes the following statement: "Plaintiffs state that Gen. Yeager has never assigned any proprietary rights in his 'name, image or trademark' to any entity."[9] Victoria signed each response after confirming the accuracy of the statements. Yet, on May 24, 2013, Victoria's Declaration stated, "On January 13, 2011, General Yeager verbally assigned and transferred to PMN all interests and rights in his image as it relates to safes, safe products, and/or

---

[6]*Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

[7]*Id.*

[8]Docket No. 74 Ex. B, at 5.

[9]Docket No. 70 Ex. B, at 6.

5

filing cabinets."[10]  These statements cannot be reconciled with one another.  Nonetheless, even if the Court disregards Victoria's Declaration, the discovery response from December 27, 2011, still indicates that PMN has an interest in Yeager's proprietary rights.  Because there is support elsewhere in the record for the statement at issue from Victoria's Declaration, the Court finds that the sham affidavit rule is inapplicable.

B.  HEARSAY

Defendant also argues that the Court should disregard the statement in Victoria's Declaration because it is inadmissible hearsay.

"At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"[11]  Rather, "the content or substance of the evidence must be admissible."[12]  "[P]arties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form."[13]  "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[14]  The statement in Victoria's Declaration does not fall within the hearsay rule because it does not contain a statement as contemplated by the rule. Moreover, it would be admissible as a verbal act.

---

[10]Docket No. 72 Ex. A.

[11]*Argo v. Blue Cross & Blue Shield, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

[12]*Id.* (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 2005)).

[13]*Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006).

[14]Fed. R. Evid. 801(c).

The hearsay rule "exclude[s] from hearsay the entire category of 'verbal acts' . . . in which the statement itself affects the legal rights of the parties."[15] Victoria has attested to a statement that affects the legal rights of both parties—the effect of the statement is to grant PMN legal rights in Yeager's name or likeness. Based on the foregoing, the Court finds that Victoria's Declaration is not inadmissible hearsay for purposes of this Motion.

C.   STANDING

The standing doctrine requires each plaintiff to show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[16]

"Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof . . . ."[17] At the summary judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of [that] motion will be taken to be true."[18]

Defendant argues that PMN lacks standing because fact discovery revealed that Mr. Yeager did not assign rights to PMN. Defendant is incorrect. As discussed above, PMN's discovery response from December 27, 2011 states that "on or around January 13, 2011, General Yeager acted to confer certain right, title and interest to his name to PMN II, LLC, with limited

---

[15] *Id.* 801 advisory committee's note.

[16] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

[17] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[18] *Id.*

7

regard to Fort Knox's use of General Yeager's name or likeness in connection with the promotion or marketing of its safes."[19]  Similarly, as discussed above, Victoria's Declaration states that "[o]n January 13, 2011, General Yeager verbally assigned and transferred to PMN all interests and rights in his image as it relates to safes, safe products, and/or filing cabinets."[20]

Defendant argues that contradictions in Plaintiffs' statements demonstrate that PMN's attestations regarding Yeager's transfer of proprietary rights are not credible. At summary judgment the court "may not make credibility determinations or weigh the evidence."[21] Therefore, the Court finds that there are facts sufficient to show an injury, thus providing a basis for standing.

IV.  SUMMARY JUDGMENT ON ALL CLAIMS

Plaintiffs assert claims for violations of common law and statutory rights of privacy, violations of the Lanham Act, and unjust enrichment. Defendant argues that summary judgment should be granted on all claims because they are barred by laches or the relevant statutes of limitation and because Yeager consented to Defendant's use of Yeager's proprietary rights. Plaintiffs argue that laches is unavailable to Defendant under the unclean hands doctrine. Plaintiffs also argue that summary judgment is not appropriate because of the many disputed issues of material fact in this case, including the scope of the original agreement, the existence and scope of any purported modifications to the agreement, and the date on which Yeager

---

[19]Docket No. 74 Ex. B, at 5.

[20]Docket No. 72 Ex. A.

[21]*Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

discovered the extent of Defendant's use of Yeager's proprietary rights. Finally, Plaintiffs argue that the claims are not barred by the statutes of limitation or laches, and that Yeager did not consent to Defendant's expansive use of his proprietary rights.

A.   UNCLEAN HANDS

Plaintiffs argue that the unclean hands doctrine prevents Defendant from asserting laches in this case. Plaintiffs assert that Yeager received one safe from Defendants in exchange for his endorsement agreement, just like every other celebrity endorsement deal entered into by Defendant. Unlike those other deals, however, Defendant made Yeager the cornerstone of its marketing campaign, including branding an entire line of safes after Yeager and using Yeager's books to entice customers to purchase Defendant's safes.

"The doctrine of unclean hands expresses the principle that 'a party [who] comes into equity for relief . . . must show that his . . . conduct has been fair, equitable, and honest as to the particular controversy in issue.'"[22] "'[E]quity does not reward one who has engaged in fraud or deceit in the business under consideration, but reserves its rewards for those who are themselves acting in fairness and good conscience, or as is sometimes said, to those who have come into court with clean hands.'"[23]

The Court cannot find that Defendant acted deceitfully in its dealings with Plaintiffs. Rather, the evidence before the Court indicates that Defendant branded and marketed its products using Yeager's name or likeness based on its understanding that this was acceptable to Yeager.

---

[22]*Goggin v. Goggin*, 299 P.3d 1079, 1097 (Utah 2013) (alterations in original) (quoting 27A Am. Jur. 2d *Equity* § 98 (2012)).

[23]*Id.* (quoting *Jacobson v. Jacobson*, 557 P.2d 156, 158 (Utah 1976)).

Plaintiff has not demonstrated that Defendant undertook any effort to hide the extent to which Yeager's name and image were used to brand and market Defendant's products. To the contrary, when Yeager visited Utah in 1989, Defendant provided Yeager with a tour of its facilities and arranged for a professional photographer to photograph Yeager posing before one of Defendant's safes. Defendant also provided additional safes to Yeager's family members throughout the years. The Court finds that whether or not Defendant in fact breached its agreement with Yeager, Defendant did not act deceitfully or fraudulently in doing so. Therefore, the unclean hands doctrine does not bar Defendant from asserting laches.

B. LACHES

Defendant argues that all of Plaintiffs' claims are barred by the doctrine of laches because Plaintiffs knew of Defendant's allegedly infringing use of Yeager's proprietary rights, and Plaintiffs' delay in bringing this claim imposes financial and evidentiary harms on Defendant. Plaintiffs contend that disputed issues of material fact prevent laches from barring any of Plaintiffs' claims and that Defendant has not suffered economic or evidentiary harms that warrant application of the doctrine.

"Laches in legal significance is not mere delay, but delay that works a disadvantage to another"[24] and is "based upon [the] maxim that equity aids the vigilant and not those who slumber on their rights."[25]  "[L]aches has two elements: (1) a party's lack of diligence, and (2) an

---

[24]*Mawhinney v. Jensen*, 232 P.2d 769, 773 (Utah 1951).

[25]*Insight Assets, Inc. v. Farias*, ___ P.3d ___, 2013 WL 3990783, at *3 (Utah Aug. 6, 2013) (alteration in original) (quoting *CIG Exploration, Inc. v. Utah*, 24 P.3d 966, 970 (Utah 2001)).

10

injury resulting from that lack of diligence."[26] "Weighing 'harm to the plaintiff' has no place in [Utah's] general laches jurisprudence."[27] Instead, when assessing these two factors, the Utah Supreme Court weighs "the relative harm caused by the petitioner's delay . . . and whether or not the respondent acted in good faith."[28]

### 1. Lack of Diligence

Defendant argues that Yeager knew or should have known about the scope of the agreement with Defendant many years before this suit was filed. Plaintiffs contend that Defendant has failed to demonstrate Yeager's lack of diligence. Plaintiffs further assert that they were unaware of the extent of Defendant's use of Yeager's proprietary rights until, at the earliest, September 2007.

The parties dispute the basic terms of the oral agreement and alleged subsequent modifications. But it is undisputed that the parties entered into some kind of agreement in the mid-1980s whereby Defendant provided Yeager with a safe in exchange for using Yeager's proprietary rights to some extent. The parties agree that Yeager was free to terminate the agreement with Defendant at any time and did not do so upon seeing Defendant continually using Yeager's image at the annual SCI Convention. It is undisputed that this agreement was in place for many years and that it ceased sometime in or around 2008 or 2009, after Victoria

---

[26]*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 238 P.3d 1054, 1063 (2010).

[27]*Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 289 P.3d 502, 510 (2012).

[28]*Lindberg*, 238 P.3d at 1063 (citing *Papanikolas Bros. Enters. v. Sugarhouse Shopping Ctr. Assocs.*, 535 P.2d 1256, 1260 (Utah 1975)).

contacted Defendant regarding their use of Yeager's proprietary rights. The parties agree that Defendant began using Yeager's name and likeness in brochures, printed advertisements, and at trade shows as early as 1986. It is further undisputed that as early as 1987 the parties' relationship included Defendant purchasing large quantities of a book authored by Yeager, shipping them to Yeager to be autographed, and Yeager shipping them back to Defendant. It is undisputed that Yeager was aware that Defendant used these autographed books to boost sales. Moreover, the parties do not dispute that Yeager did not charge Defendants a fee for these autographs.

The book-signing arrangement is of great significance to the laches analysis. Plaintiffs allege that the agreement was limited to Defendant's use of Yeager's proprietary rights at the SCI Conventions. However, once Yeager began autographing a large number of books for Defendant, it would have become clear to Yeager that his relationship with Defendant had moved beyond Plaintiffs' claimed understanding of the original agreement.

Even if the Court accepts Plaintiffs' position that Yeager's relationship with Defendant was originally confined to Defendant's advertising at the SCI Convention, that relationship had fundamentally changed once Yeager signed a significant number of books for Defendant to use as a way to boost sales. Yeager began signing books for Defendant twenty-four years before the Complaint was filed in this case. Moreover, even if Yeager was unaware of his rights until September 2007, he exercised no diligence to inquire with Defendant once he was on notice that Defendant was operating under a belief that the parties' relationship was more expansive than Plaintiffs assert in this suit. At that point in the parties' relationship, Yeager was in frequent contact Defendant through his shipments of signed books and Yeager was in a position to inquire

quite easily about the nature of his relationship with Defendant. Therefore, the Court finds that Plaintiffs lacked diligence in inquiring into the nature of the parties' relationship and the terms of their agreement, and in bringing the claims in this suit.

## 2. *Injury from Lack of Diligence*

Defendant argues that it suffered both evidentiary and economic harms due to Plaintiffs' delayed filing. Defendant argues that evidence has been lost to faded memory and the deaths of persons relevant to the parties' relationship—namely, Yeager's previous spouse, Glennis Yeager, and the man who introduced the parties, Arvo Ojala. Based on Defendant's understanding of the agreement, Defendant conducted extensive advertising campaigns using Yeager's name and likeness, and named a line of safes after Yeager. Consequently, Defendant also argues that Plaintiffs' claimed damages are based in part on Defendant's sales over the decades during which Plaintiffs' claims already should have been filed.

Plaintiffs contend that the depositions demonstrate that Defendant's memory of the key events does not appear to have faded and that Mr. Ojala had no first-hand knowledge of the events at issue in this suit. Plaintiffs also argue that Defendant's economic harms are largely irrelevant because the financial costs associated with Defendant's business decisions were not made in reliance on Plaintiffs' delay in filing suit.

"Although lapse of time is an essential part of laches, the length of time must depend on the circumstances of each case, for the propriety of refusing a claim is equally predicated upon the gravity of the prejudice suffered by defendant and the length of plaintiff's delay."[29] The Utah Supreme Court recently applied the doctrine of laches where parties "changed their

---

[29] *Papanikolas Bros.*, 535 P.2d at 1260.

13

position" in reliance on a plaintiff's delay in bringing claims arising from the event that forms the basis for the suit.[30] "[U]navailable or long-lost evidence and witnesses [are] long recognized as prejudice-causing results of delay."[31] It is well established that laches is appropriate where a plaintiff's delay is so substantial that "the transaction has faded from memory."[32]

At summary judgment, the Court is unable to determine whether economic harms exist. The parties dispute material facts critical to making this determination, such as the scope of the original agreement and the existence and scope of any modifications to the agreement. If the agreement was limited to advertising at the SCI Conventions, then Defendant could not reasonably rely on the agreement to develop Defendant's general advertising and branding efforts around Yeager's proprietary rights. On the other hand, if the agreement contemplated more flexibility, then the business decisions Defendant made in reliance on that agreement could conceivably constitute economic harms under laches.

The evidentiary harms suffered by Defendant, however, are clearer. First, it is undisputed that Yeager's previous wife, Glennis, took care of his business interests during the 1980s and passed away in 1990. Glennis would have been a critical witness to the key events at issue in this case. Similarly, employees who worked for Defendant during the relevant period are no longer with the company and may be difficult to locate. Second, the initial oral agreement

---

[30]*Lindberg*, 238 P.3d at 1062, 1065.

[31]*Horne*, 289 P.3d at 512.

[32]*Kuhn v. Mount*, 44 P. 1036, 1038 (Utah 1896); *accord Insight Assets*, 2013 WL 3990783, at *4 ("[T]he passage of time has made it difficult for [the defendant] to gather evidence in his defense."); *Young v. W. Piling & Sheeting*, 680 P.2d 394, 395 (Utah 1984) ("The prejudice and disadvantage to the defendant is readily apparent. Some witnesses may no longer be available; recollections may be dimmed.").

14

took place nearly a quarter century ago and the two men who made the agreement are now both in their eighties. After more than two decades, the parties' memories of their transaction have faded. Consequently, the Court finds that Plaintiffs' decades-long delay in bringing this suit has allowed memories to dim and prejudiced Defendant's ability to defend against the claims.

In light of the foregoing, the Court finds the doctrine of laches applicable to this case and will dismiss Plaintiffs' claims with prejudice.

## V.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendant's Motion for Summary Judgment Regarding Plaintiff PMN II, LLC's Claims (Docket No. 70) is DENIED. It is further

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 76) is GRANTED.

The Clerk of Court is directed enter judgment in favor of Defendant and against Plaintiffs and close this case forthwith.

DATED this 23rd day of December, 2013.

BY THE COURT:

TED STEWART
United States District Judge